## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIKA EBERHARDINGER,** | : | **CIVIL ACTION NO. 1:16-CV-2481** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF YORK**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

In the early morning hours of December 19, 2014, plaintiff Erika Eberhardinger ("Eberhardinger") left a bar with Mason Millen ("Millen") and defendant Matthew Foster ("Foster"). Foster, who later admitted to consuming multiple alcoholic beverages that evening, drove Eberhardinger's vehicle. A police officer witnessed Foster violate several traffic laws and attempted to pull the car over. Instead of stopping, Foster began a high-speed chase, which eventually ended when another officer shot four times at Eberhardinger's vehicle. Tragically, several bullets struck Eberhardinger, causing serious injuries. Eberhardinger advances constitutional claims against the officer who fired the shots and the City of York, Pennsylvania ("the City"). She also brings contractual claims against her own automobile insurance provider, State Farm Mutual Automobile Insurance Company ("State Farm"), for denying certain coverage for her injuries. The officer, the City, and State Farm move for summary judgment on all remaining claims against them.

# I.    Factual Background and Procedural History[1]

## A.    The Events of December 19, 2014

At approximately 1:45 a.m. on December 19, 2014, Eberhardinger, Millen, and Foster left the Banana Max Bar & Grill in York, Pennsylvania in Eberhardinger's car. (Doc. 58-2 ¶ 1; Doc. 61 ¶ 1). Eberhardinger sat in the front passenger seat, Millen sat in the rear passenger seat, and Foster drove with Eberhardinger's permission. (Doc. 58-2 ¶ 2; Doc. 61 ¶ 7). Foster—who did not have a valid driver's license at the time—admitted that he consumed several beers and multiple shots of hard liquor over the course of the evening and that he was intoxicated when he left the bar. (Doc. 58-2 ¶¶ 26, 28, 30).

Not long into the drive, York City Police Officer Benjamin Praster ("Officer Praster") witnessed Foster pause in an intersection even though he had the right of way. (Doc. 58-2 ¶¶ 3-4, 32; Doc. 61 ¶ 10; Doc. 58-6 Ex. I at 5, 12). Officer Praster began following Foster, who increased his speed well above the legal limit and ran a stop sign. (Doc. 58-2 ¶¶ 33-34; Doc. 58-6 Ex. I at 5). Officer Praster activated his

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 58-2, 65, 61, 67). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

emergency lights and siren and attempted to execute a traffic stop of Eberhardinger's car. (Doc. 58-2 ¶ 35; Doc. 61 ¶ 10).

Foster did not pull over. (Doc. 61 ¶ 11). He instead led Officer Praster on a high-speed pursuit through the streets of York, during which Foster ran multiple stop signs and traveled in the wrong direction on several one-way streets. (Id.; Doc. 58-2 ¶¶ 86, 146-48; Doc. 58-6 Ex. N at 0:01-2:05). The chase lasted a little over two minutes, and it does not appear that any other occupied vehicles or pedestrians were encountered. (Doc. 58-6 Ex. N. at 0:01-2:05). During his pursuit, Officer Praster radioed that he was attempting to pull over a vehicle that was failing to stop. (Doc. 58-2 ¶ 83). York City Police Officer Benjamin Smith ("Officer Smith") was on duty five blocks away; he heard Officer Praster's transmission on his police radio, engaged his emergency lights and siren, and drove to the general area of the pursuit. (Id. ¶¶ 84-85, 87).

When Foster reached West Gay Street—a single-lane, one-way road permitting only eastbound travel—he began driving the wrong way (westbound) down the street. (Doc. 61 ¶ 12; Doc. 58-2 ¶ 88). Officer Smith entered West Gay Street traveling eastbound facing Foster's approaching vehicle, and Officer Praster entered from the opposite end of the street following Foster from behind. (Doc. 61 ¶ 13; Doc. 58-2 ¶ 92). Foster was "boxed in" by the police cruisers, cutting off any exit. (Doc. 58-6 Ex. I at 15; Doc. 58-5 Ex. G, Smith Dep. at 17:13-18:7; Doc. 58-5 Ex. D, Foster Dep. at 20:5-15, 22:2-9). Officer Smith parked his vehicle in the middle of West Gay Street facing east, blocking Foster's path. (Doc. 61 ¶ 14; Doc. 58-2 ¶ 95). To Officer Smith's left (on the north side of West Gay Street) was a guardrail and a

drop-off to railroad tracks, and to his right (on the south side of the street) were parked vehicles. (Doc. 58-2 ¶¶ 90-91).

Foster saw Officer Smith's patrol car parked in the street in front of him and stopped Eberhardinger's car. (Doc. 61 ¶ 15). Immediately after Foster came to a stop, Officer Smith exited his patrol car with his service weapon drawn and started running on foot in pursuit of Foster, who had begun backing up in an eastbound direction. (Doc. 82, Eberhardinger Ex. Video Clip 2 ("Pl.'s Video Ex.") at 1:08-1:20[2]; Doc. 58-2 ¶ 8). Officer Smith ran toward the reversing Eberhardinger vehicle and shouted "Get your fucking hands up!" (Doc. 58-2 ¶ 99; Doc. 65 ¶ 99; Pl.'s Video Ex. at 1:21-1:22). Officer Smith was unaware that there were any passengers in the vehicle until after it later came to rest and Eberhardinger and Millen climbed out. (Doc. 58-6 Ex. I at 15, 16; Doc. 58-6 Ex. J at 16, 17). As Foster was driving backward, he struck a telephone pole with the rear of the vehicle and came to a stop. (Doc. 61 ¶ 16). Foster briefly hesitated and then began driving forward in a westbound direction. (Pl.'s Video Ex. at 1:20-1:25).

---

[2] The City and Officer Smith request that we not consider the video Eberhardinger provided, which was submitted several months after the motions for summary judgment were filed. We decline this request for several reasons. First, although the City and Officer Smith broadly question the "methodology" of "how the audio and video files were synchronized and whether there is a sound delay," (Doc. 86 at 5), they do not dispute the accuracy of any particular part of the video, which appears to be synched correctly with the audio. Indeed, the dashcam videos Eberhardinger combined and submitted were provided to her by the City and Officer Smith. (Id. at 4). Second, Eberhardinger submitted the video in May 2018, and the City and Officer Smith have not raised any specific issue with its accuracy. Finally, the video files provided by the City and Officer Smith lack audio, a crucial element in the instant case.

The parties vehemently dispute the facts and sequence of events that followed. The City and Officer Smith maintain that Foster drove the vehicle directly toward Officer Smith, and that Officer Smith had to jump out of the way as Foster's vehicle "came within inches of Officer Smith's body and he could feel the wind as the vehicle passed by." (Doc. 58-2 ¶¶ 105-07, 112). Officer Smith avers that he "heard the tires squeal and the engine revving" after Foster collided with the telephone pole, and that as the vehicle drove towards him at a high rate of speed he discharged his firearm "in fear for his life," aiming at the center mass of the driver. (Id. ¶¶ 107, 109-10). Officer Smith contends that he "could not get out of the way" of Foster's vehicle because of the parked cars and the guardrail on either side of the street, and that *after* he discharged his firearm, "the vehicle swerved to the left [in his direction], [he] jumped to his right, hit a parked car with his body, and the vehicle passed him." (Id. ¶ 111). He maintains that he "stopped firing his firearm when the vehicle passed him completely and the threat was gone." (Id. ¶ 113).

Eberhardinger, *per contra*, avers that although Foster drove the vehicle forward after hitting the telephone pole, he never drove toward Officer Smith and was not driving fast. (Doc. 65 ¶¶ 100, 105, 107). According to Eberhardinger, Officer Smith was not in danger when he fired his service weapon, as he was already out of the way and standing safely between the parked cars on the south side of the street. (Id. ¶¶ 106, 108, 111). She maintains that Officer Smith discharged his firearm after the vehicle had passed him or at least had partially passed him. (Id. ¶¶ 109, 111, 113).

The parties agree that Officer Smith fired four shots at the vehicle. (Doc. 58-2 ¶ 11). Police reports, which include an interview with the treating physician, indicate that Eberhardinger was struck by two of the bullets. (Doc. 58-6 Ex. I at 7, 30; Doc. 58-6 Ex. J at 4). Eberhardinger was taken from the scene to the hospital for treatment of gunshot wounds to her jaw, forearm, and hand. (Doc. 61 ¶¶ 24-26). Foster was taken into custody and eventually pled guilty to fleeing or attempting to elude an officer, driving while operating privileges are suspended or revoked, driving under the combined influence of alcohol and drugs, and three counts of reckless endangerment. (Doc. 58-2 ¶ 137; Doc. 58-6 Ex. L at 4-5). He also pled no contest to a charge of aggravated assault in relation to Officer Smith. (Doc. 58-2 ¶ 137; Doc. 58-6 Ex. L at 4-5).

## B.     The Insurance Claims

Eberhardinger had an automobile insurance policy with State Farm that was in effect at the time of the incident. (Doc. 61 ¶ 34). The policy covered the vehicle involved, which Eberhardinger owned. (Id. ¶ 49). She sought both Personal Injury Protection ("PIP") or Medical Payments Coverage for her medical treatment, as well as Underinsured Motorist ("UIM") benefits from State Farm. (Id.) State Farm denied PIP and UIM coverage, asserting, *inter alia*, that the gunshot-inflicted injuries and resultant treatment "did not arise out of the maintenance or use of a motor vehicle." (Doc. 61-9 Ex. K).

## C.     Procedural History

Eberhardinger commenced this action in December 2016. Following Rule 12 motion practice, Eberhardinger filed an amended complaint in October 2017,

asserting a Section 1983 excessive force claim against Officer Smith (Count I), a Monell claim for failure to train against the City (Count II), a state law negligence claim against Foster (Count III), breach of contract claims against State Farm for failure to make PIP payments (Count IV) and failure to make UIM payments (Count V), and a bad faith claim against State Farm for unreasonably denying insurance coverage (Count VI). The City, Officer Smith, and State Farm move for summary judgment on all claims against them.[3] The motions are fully briefed and ripe for disposition.

## II.    Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477

---

[3] State Farm also moved to dismiss the bad faith claim in Eberhardinger's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (See Doc. 51). Because the bad faith claim does not survive Rule 56 scrutiny, we will dismiss the Rule 12(b)(6) motion as moot.

U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587-89 (1986). Only if this threshold is met may the cause of action proceed.

<u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.   <u>Discussion</u>

Eberhardinger alleges constitutional violations by the City and Officer Smith,

as well as breach of contract and bad faith by State Farm.[4] We begin with the

constitutional claims.

### A.      **Constitutional Claims Under 42 U.S.C. § 1983**

Section 1983 of Title 42 of the United States Code creates a private cause

of action to redress constitutional wrongs committed by state officials. 42 U.S.C.

§ 1983. The statute is not a source of substantive rights, but serves as a mechanism

for vindicating rights otherwise protected by federal law. <u>Gonzaga Univ. v. Doe</u>, 536

U.S. 273, 284-85 (2002); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996). To

establish a Section 1983 claim, plaintiffs must prove a deprivation of a "right

secured by the Constitution and the laws of the United States . . . by a person acting

under color of state law." <u>Kneipp</u>, 95 F.3d at 1204 (quoting <u>Mark v. Borough of</u>

<u>Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Eberhardinger asserts that the City failed to properly train its police officers

regarding the use of force and, in particular, firing their service weapons at vehicle

windshields. She also contends that Officer Smith used excessive force in violation

of the Fourth Amendment by firing four shots at her vehicle when the vehicle was

---

[4] The only count in the amended complaint not challenged on summary
judgment is Count III, state law negligence against Foster.

passing him or had passed him.  The City and Officer Smith do not dispute that they are state actors, but contend that Eberhardinger has not adduced sufficient evidence of a constitutional deprivation to meet her burden in opposing summary judgment.  We will examine the Section 1983 claims *seriatim*.

### 1. *Monell Claim for Failure to Train Against the City*

Municipalities and other local governments are "persons" for purposes of Section 1983 liability, see Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978), but such entities are not responsible for every constitutional tort inflicted by their employees, Connick v. Thompson, 563 U.S. 51, 60 (2011).  Municipalities are responsible only for "their *own* illegal acts" and are not subject to *respondeat superior* liability.  Id. (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)).

To bring a Section 1983 claim against a municipality, the plaintiff must show that "the alleged constitutional transgression implements or executes a policy, regulation[,] or decision officially adopted by the governing body or informally adopted by custom."  Mulholland v. Gov't Cty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013) (citation omitted).  In other words, a plaintiff can establish Section 1983 municipal liability in two ways: policy or custom.  Watson v. Abington Township, 478 F.3d 144, 155 (3d Cir. 2007).  The Third Circuit has explained that, to prove liability, the plaintiff must establish that the municipal policy or custom was itself unconstitutional or was the "moving force" behind the constitutional deprivation.  Thomas, 749 F.3d at 222 (citation omitted).  Thus, to prevail on a Monell claim, a plaintiff must identify the challenged policy or custom, demonstrate proper attribution to the public entity, and show a causal link between the execution of the

policy or custom and the injury suffered.  See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).

A Monell claim premised on the alleged failure to train employees requires the plaintiff to show that the alleged training deficiency amounts to "deliberate indifference" to the constitutional rights of individuals who will come into contact with those employees.  Thomas, 749 F.3d at 222 (quoting Carter v. City of Philadelphia, 181 F.3d 339, 357 (3d Cir. 1999)).  This demanding standard requires evidence that the municipality "disregarded a known or obvious consequence" of its action.  Connick, 563 U.S. at 61.  The alleged training deficiency must be closely related to the constitutional injury suffered by the plaintiff.  Id.

Ordinarily, a pattern of constitutional violations will give notice to a municipal actor that new or different training is necessary, and continued adherence to the original training program will demonstrate the "conscious disregard" required to establish deliberate indifference.  Thomas, 749 F.3d at 223 (citation omitted).  There are certain situations, however, where the need for training is "so obvious" that, even without a pattern of previous constitutional violations, failing to provide such training could rise to the level of deliberate indifference.  Id. (quoting City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989)).  Such "single-incident" failure-to-train liability turns on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights."  Id. at 223-24 (alteration in original) (quoting Bd. of Cty. Comm'rs. v. Brown, 520 U.S. 397, 409 (1997)).  Eberhardinger

does not reference any prior constitutional violations by the City. Accordingly, we construe her <u>Monell</u> claim as sounding in single-incident failure-to-train liability.

Eberhardinger argues that the City police department's use-of-force policy and the resultant training given to its officers are inherently insufficient and show deliberate indifference. She contends that the City improperly trains its officers regarding shooting at vehicles. She also alleges that the policy does not even mention shooting at windshields, despite the fact that many experts and other police departments—including the largest police department in Pennsylvania—have specifically addressed this issue.

The York City Police Department's use-of-force policy specifically states that "[f]iring a weapon at . . . a moving vehicle" is generally prohibited because "it is rarely effective and is extremely hazardous to innocent persons." (Doc. 58-6 Ex. K at 6). The exceptions to this rule are (1) "[i]f the occupants of another vehicle are using deadly force against the officer or another person, either with or from a vehicle," and (2) "[i]f no other alternative is available based on the presenting circumstances." (<u>Id.</u>) Police officers are provided with this policy, receive use-of-force training, and take a written test on the use of force. (Doc. 58-2 ¶ 119).

To support her failure-to-train claim, Eberhardinger relies on an expert report from Dr. Geoffrey Alpert, who opines simply that "[m]any police departments in the [United States] prohibit shooting at moving vehicles, including windshields[,] and train officers to get out of the way." (Doc. 66-2 at 6). She also cites the deposition of York City Chief of Police Wesley Kahley, who testified that he did not have specific training or research-based knowledge on shooting at

windshields, that such a practice was not specifically prohibited by the City's use-of-force policy, and that he was not aware of other police departments' policies on shooting at windshields.  (Doc. 66-3 at 23-25).

A reasonable juror could not find single-incident failure-to-train liability from such scant support.  Eberhardinger has not put forth sufficient evidence to establish that the City's policy and training regarding shooting at moving vehicles is so obviously deficient as to evince deliberate indifference to the constitutional rights of those who come into contact with the City's police officers.  Thomas, 749 F.3d at 222-23 (citations omitted).  Eberhardinger has not proffered, for example, evidence of different policies or standards promulgated by other police departments regarding shooting at moving vehicles or windshields; research or studies supporting an alternative or superior policy; or evidence regarding the frequency with which police officers (in the City or elsewhere) fire at moving vehicles, causing injuries to innocent passengers or bystanders.  See, e.g., id. at 225.  Consequently, Eberhardinger's Monell claim against the City fails as a matter of law, and the court will grant summary judgment in the City's favor.

### 2. *Fourth Amendment Excessive Force Claim Against Officer Smith*

Eberhardinger also contends that Officer Smith's use of deadly force was excessive and violated her Fourth Amendment rights.  Officer Smith counters that using deadly force was reasonable under the totality of the circumstances and that qualified immunity shields him from civil liability.  We begin with Officer Smith's qualified immunity defense.

### a. **Qualified Immunity**

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 244-45 (2009). No liability will attach if a reasonable actor could have believed the challenged conduct was in compliance with settled law. <u>Id.</u>; <u>see</u> <u>also</u> <u>Springer v. Henry</u>, 435 F.3d 268, 280 (3d Cir. 2006). The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (emphasis omitted), and "ensure[s] that insubstantial claims against government officials [will] be resolved prior to discovery." <u>Pearson</u>, 555 U.S. at 231-32 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 n.2 (1987)). The defense generally shields "all but the plainly incompetent or those who knowingly violate the law." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). The burden to establish qualified immunity rests with the defendant claiming its protection. <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A court evaluating a claim of qualified immunity considers two distinct inquiries: whether, based on the record evidence, a constitutional right has been violated and, if so, whether that right was "clearly established" at the time of the alleged violation. <u>See</u> <u>Spady v. Bethlehem Area Sch. Dist.</u>, 800 F.3d 633, 637 (3d Cir. 2015) (quoting <u>Pearson</u>, 555 U.S. at 232). A court may begin its qualified immunity analysis with either prong. <u>Pearson</u>, 555 U.S. at 236. Officer Smith argues that Eberhardinger has not proven that he violated her Fourth Amendment rights and that, assuming *arguendo* she had, at the time of the incident and under the facts

presented, he did not have fair notice that his actions would violate the Fourth Amendment. We cannot agree.

The Supreme Court of the United States has repeatedly admonished that, when analyzing qualified immunity, courts should not "define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); see also Kisela v. Hughes, 584 U.S. __, 138 S. Ct. 1148, 1152-53 (2018); Mullenix v. Luna, 577 U.S. __, 136 S. Ct. 305, 308 (2015). A plaintiff need not produce a case directly on point, but existing precedent must have placed the constitutional question "beyond debate." Mullenix, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 741). The state actor must have "fair notice" that his conduct was impermissible under federal law; thus the reasonableness of his actions "is judged against the backdrop of the law at the time of the conduct." Kisela, 138 S. Ct. 1152. The appropriate inquiry is whether the Constitution prohibited the officer's conduct in "the specific context of the case," viz., the situation the officer confronted. Mullenix, 136 S. Ct. at 308-09 (citing Haugen v. Brosseau, 543 U.S. 194, 199-200 (2004)). The Court, nevertheless, has consistently recognized that general statements of the law can suffice to give "fair and clear warning" to state actors when the facts and circumstances represent an "obvious case" of unlawfulness. Kisela, 138 S. Ct. at 1153; White v. Pauly, 580 U.S. __, 137 S. Ct. 548, 552 (2017).

According to Officer Smith's version of the facts, he faced the following situation on December 19, 2014. Foster had led Officer Praster on a high-speed pursuit during which Foster ran stop signs and violated other traffic laws. When Officer Smith responded to the scene and parked his car in the middle of West Gay

Street, he encountered Eberhardinger's car, which stopped and began moving quickly in reverse. Officer Smith then exited his vehicle while drawing his service weapon and pursued Foster on foot. Foster hit a telephone pole as he was driving backward, but immediately began driving forward again. Officer Smith heard the engine revving and the tires squeal, and saw the car coming directly toward him at a high rate of speed. Fearing for his life and as a last resort, he discharged his firearm as the vehicle was driving at him and thereafter had to jump out of the way to avoid being hit by Foster. Foster later pled guilty to reckless endangerment and no contest to aggravated assault.[5]

Eberhardinger's version of events differs substantially from Officer Smith's. See *supra* at 4-5. More importantly, the video footage of the incident contradicts many significant aspects of Officer Smith's account.[6] The video demonstrates that, although Foster began to drive forward after hitting the telephone pole, he was not driving fast. (Pl.'s Video Ex. at 1:22-1:26). Furthermore, Foster appears to simply be driving down the street rather than driving "at" Officer Smith. (Id.) The car, which initially was pointed to the left after it hit the pole, does change directions, but it merely adjusts from a left-pointed angle to a straight path following West Gay Street. (Id. at 1:22-1:29). The video also provides clear audio evidence of the vehicle

_____

[5] We reject Officer Smith's assertion that Foster's convictions are dispositive as to Eberhardinger's excessive force claim. Such evidence is relevant, but it does not settle the Fourth Amendment questions in this case.

[6] Both the Third Circuit and the Supreme Court have underscored the district court's obligation to closely review video evidence when necessary to determine if there are disputed issues of material fact. See Bland v. City of Newark, 900 F.3d 77, 86 n.7 (3d Cir. 2018); Scott v. Harris, 550 U.S. 372, 378-81 (2007).

crashing into the pole and then pulling away, but contains no such evidence of the engine revving or tires squealing. (Id. at 1:21-1:24). Most significantly, the video shows that Officer Smith fired most, *if not all*, of the shots *after* he had moved out of the path of the vehicle and positioned himself near the parked cars on the south side of the street, and as the vehicle was passing him or after it had passed him completely. (Id. at 1:22-1:28).

An inspection of Eberhardinger's vehicle after the incident provides further support for her version of events. According to a police report and the investigation by the York County District Attorney, three bullet impacts were located in the vehicle. (Doc. 58-6 Ex. I at 34; Doc. 58-6 Ex. J at 7). One bullet hole was found in the hood and the damage indicated that the shot had come from in front of the vehicle but originated from the left of the driver. (Id.) Another bullet struck the lower right portion of the windshield "near the driver's side A pillar," also coming from the left side of the driver. (Doc. 58-6 Ex. I at 9, 34; Doc. 58-6 Ex. J at 7). A third bullet struck the rear driver's side passenger door. (Doc. 58-6 Ex. I at 10, 34; Doc. 58-6 Ex. J at 7). Investigators believed that a fourth bullet entered the car through the partially open driver's side window and struck Eberhardinger. (Doc. 58-6 Ex. I at 34; Doc. 58-6 Ex. J at 7). This ballistic evidence suggests that all of the bullets were fired from a position to the left of the vehicle, and at least two of the shots were fired as the vehicle was passing or had completely passed Officer Smith.

Viewing the facts in a light most favorable to Eberhardinger, we are left with the following scenario. Around 2:00 a.m., Officer Smith responded to Officer Praster's radio communications that a vehicle had broken minor traffic laws and

was fleeing from police. The pursuit lasted only two minutes and no other vehicles or pedestrians were involved. Officer Smith encountered the suspect driving the wrong way on a one-way street and blocked the vehicle's path with his patrol car. The suspect's vehicle was "boxed in" by the police cruisers of Officers Smith and Praster, cutting off any exit. There were no other occupied vehicles, bystanders, or pedestrians in the immediate area. Officer Smith did not know there were any passengers in the suspect's car until later when the vehicle finally came to rest and all three occupants climbed out. When Foster began to reverse, Officer Smith exited his patrol car while simultaneously drawing his gun and ran towards the vehicle. After striking the telephone pole in reverse, Foster straightened out from a left-pointing angle and began moving forward at a slow rate of speed down West Gay Street. Officer Smith moved out of the middle of the street and took up a position several feet to the left of the vehicle a few seconds before the vehicle reached him. The forward-moving vehicle was not pointed in Officer Smith's direction when he began firing. Most importantly, Officer Smith—standing to the left of the slow-moving vehicle and apparently out of harm's way—fired four shots at the driver as the vehicle was passing him or had completely passed him, indicating that he used deadly force to stop the fleeing suspect rather than out of fear of immediate personal harm.

We find that using deadly force when confronted with such circumstances violates clearly established law. Contrary to most excessive force claims, the instant situation represents an "obvious case" where general excessive force principles found in Graham v. Connor, 490 U.S. 386, 396 (1989), and Tennessee v. Garner, 471

U.S. 1 (1985), give "fair and clear warning" that Officer Smith's conduct violated federal law. See Kisela, 138 S. Ct. at 1153. In particular, Garner admonishes that even if a suspect is attempting to flee, "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead," and that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Garner, 471 U.S. at 11.

Even assuming that the matter *sub judice* does not fall into the "obvious case" category, multiple circuit court cases place the constitutional question beyond debate. In Smith v. Cupp, 430 F.3d 766 (6th Cir. 2005), a recently arrested suspect stole a police cruiser in an attempt to flee and was shot and killed by the arresting officer. Cupp, 430 F.3d at 770. The officer, who had fired four shots at the fleeing suspect's vehicle, claimed that he feared for his life and that of a bystander and discharged his service weapon "as the cruiser was bearing down on" him. Id. The court rejected the officer's qualified immunity defense, finding that, under the non-movant's version of the facts, the officer's use of deadly force violated the decedent's clearly established constitutional rights. Id. at 773. The record indicated that—contrary to the officer's account—the fatal shot was fired as the vehicle was passing the officer or had already passed him, with the bullet entering the car through the driver's-side window and striking the suspect in the head in a back-to-front angle. Id. at 771, 774. The situation confronted by the officer, the court held, was one where an unarmed suspect had been arrested for a nonviolent, minor offense and, even though he was attempting to flee from police, there was no immediate danger

to the officer or anyone in the vicinity.  Id. at 774.  Under such conditions, the use of deadly force was an "obvious" violation of clearly established law, and a reasonable juror could find the officer's actions unconstitutional.  Id. at 775-77.

Similarly, in Adams v. Speers, 473 F.3d 989 (9th Cir. 2007), the Ninth Circuit found that firing six rounds into the vehicle of an unarmed, non-dangerous suspect, in the absence of immediate danger to police officers or others, was an obvious violation of clearly established law.  In that case, the 18-year-old suspect drove through several stop signs, and a police officer attempted to pull him over.  Adams, 473 F.3d at 991.  The suspect led police on an hour-long pursuit involving multiple police vehicles.  Id.  The defendant officer joined the pursuit on his own volition and ended the chase by knocking the suspect's vehicle off the road and down an embankment.  Id.  Multiple police units surrounded the vehicle, "cutting off any possible avenue of escape."  Id. at 991-92.  The suspect began to drive again slowly, and another officer broke the driver's side window intending to incapacitate the suspect with pepper spray.  Id. at 992.  Without warning, the defendant officer exited his cruiser, stood in front of the suspect's vehicle as it rolled away, and fired six shots without "a completely clear background for discharging his weapon."  Id. The suspect was killed.  Id.  The court of appeals had little difficulty finding that, under the circumstances confronted, the use of deadly force obviously violated clearly established law and the defendant officer was not entitled to qualified immunity.  Id. at 993-94.

The instant facts are even more straightforward than the circumstances faced by law enforcement in Cupp and Adams.  Under Eberhardinger's version of

events, Officer Smith—without fear of immediate danger to himself or others—fired four shots at an unarmed, non-violent suspect driving a slow-moving vehicle down a one-lane street without any chance of escape while that vehicle was passing or had already passed Officer Smith.  Such actions violate clearly established law.  See Cupp, 430 F.3d at 775-77; Adams, 473 F.3d at 994; see also Kisela, 138 S. Ct. at 1153; Garner, 471 U.S. at 11.

Officer Smith's reliance on Plumhoff v. Rickard, 572 U.S. __, 134 S. Ct. 2012 (2014), and Scott v. Harris, 550 U.S. 372 (2007), is misplaced.  Both cases are easily distinguishable from the instant matter.  In Plumhoff, the suspect led numerous police vehicles on a chase reaching speeds of over 100 miles per hour, swerving through traffic on a major interstate and passing more than two dozen vehicles, some of which had to alter course to avoid collision.  Plumhoff, 134 S. Ct. at 2017, 2021.  The suspect hit three different police cruisers during the pursuit.  Id. at 2017.  After colliding with the third police vehicle and appearing to be stopped, an officer approached the suspect with his gun drawn and pounded on the passenger-side window, but the suspect continued to rev his engine, spin his tires, rock the vehicle back and forth, and attempt to push a police cruiser out of the way to continue his flight.  Id.  Only then did officers fire at the vehicle.  Id. at 2017-18.  The Court found that because the suspect's flight "posed a grave public safety risk," using deadly force to end the chase was reasonable.  Id. at 2022.

Similarly, in Scott, a fleeing suspect led numerous police officers on a dangerous chase, swerving around more than a dozen vehicles and forcing cars traveling in both directions off the road.  Scott, 550 U.S. at 379.  At one point the

suspect appeared to be cornered, but he struck a police vehicle and sped off. Id. at 375. The Court found that the officer who eventually ended the chase by pushing the suspect's vehicle off the road was justified in using deadly force because the suspect had placed "police officers and innocent bystanders alike at great risk of serious injury." Id. at 380. We find that Plumhoff and Scott represent very different circumstances and thus are inapposite to the matter at hand.

We need not labor over the second qualified immunity prong: whether a constitutional violation occurred. Determining the reasonableness of a Fourth Amendment seizure requires a totality-of-the-circumstances analysis that considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Based on the facts and circumstances as proffered by Eberhardinger, a reasonable juror could find that these factors militate in her favor and establish that Officer Smith's particular use of force was unreasonable. As the Third Circuit has explained, the mere fact that a vehicle is fleeing police "does not necessarily render an officer's use of deadly force objectively reasonable." Davenport v. Borough of Homestead, 870 F.3d 273, 280 (3d Cir. 2017) (citing Garner, 471 U.S. at 8-9). Accordingly, genuine disputes of material fact preclude summary judgment on Officer Smith's defense of qualified immunity. See Tolan v. Cotton, 572 U.S. __, 134 S. Ct. 1861, 1866 (2014).

### b.    Fourth Amendment Violation

The foregoing analysis establishes that Eberhardinger has adduced sufficient evidence to satisfy her Rule 56 burden. A reasonable juror could find that Officer

Smith violated Eberhardinger's Fourth Amendment rights by using excessive force. Summary judgment for Officer Smith on the substantive Section 1983 excessive force claim, therefore, is inappropriate due to genuine disputes of material fact regarding the circumstances of the shooting. We will deny Officer Smith's motion for summary judgment on this claim.

### B.     Insurance Claims Against State Farm

We next consider Eberhardinger's insurance-related claims against State Farm. State Farm moves for summary judgment on all three counts: breach of contract for failure to pay PIP benefits, breach of contract for failure to pay UIM benefits, and bad faith. We will examine the breach of contract claims together before turning to the bad faith claim.

### 1.     *Breach of Contract*

It is undisputed that Eberhardinger had PIP or first-party "Medical Payments Coverage" as well as UIM coverage on her State Farm automobile insurance policy. The parties likewise agree that Eberhardinger sought payment from State Farm under these provisions for her gunshot-related injuries stemming from the December 2014 incident.[7] The parties disagree, however, whether these injuries qualify for coverage under the applicable language of the PIP and UIM provisions of her policy.

---

[7] Eberhardinger contends that she suffered bodily injuries from the incident that were unrelated to the gunshot wounds. (Doc. 68 at 10). We reject this eleventh-hour assertion because Eberhardinger fails to support it with record evidence, admits that she did not receive any medical treatment for non-gunshot-related injuries, (Doc. 61 ¶ 31; Doc. 67 ¶ 31), and does not appear to have sought reimbursement for any such injury from State Farm, (see Doc. 72 at 6 n.8).

The pertinent language of the PIP policy states that State Farm "will pay for medical expenses for bodily injury to an insured *arising out of the maintenance or use of a motor vehicle*." (Doc. 61-3 Ex. C at 12 (emphasis added)). The UIM policy states, in relevant part, that State Farm will pay for bodily injuries sustained by the insured which are "*caused by an accident that involves the ownership, maintenance, or use of an underinsured motor vehicle*[.]" (Id. at 24 (emphasis added)). The parties acknowledge that, despite the slightly different wording, these clauses implicate identical interpretation issues.

There is no question that Eberhardinger was an occupant of the insured vehicle when injured and that her injuries required extensive medical treatment. But State Farm maintains that the gunshot-related injuries do not arise out of the maintenance or use of a motor vehicle. According to State Farm, that particular phrase has a well-settled meaning under Pennsylvania law. Pennsylvania courts have repeatedly interpreted that language—found both in automobile insurance policies and the Motor Vehicle Financial Responsibility Law, 75 Pa. Cons. Stat. §§ 1701-1799.7—to require a causal connection between the injury and the use of a vehicle.[8] State Farm argues that the gunshot injuries Eberhardinger suffered have no such connection.

Eberhardinger counters that the phrase is ambiguous because it is subject to different interpretations. She posits that because the policy itself does not define

---

[8] The parties agree that Pennsylvania law governs the interpretation of Eberhardinger's insurance policy and the state law claims for breach of contract and bad faith.

the term "maintenance or use," the insured must rely on extrinsic materials to understand the policy. This need to rely on outside materials, Eberhardinger argues, creates a genuine dispute of material fact that precludes summary judgment. Eberhardinger is incorrect for two reasons.

First, Eberhardinger's contention that the phrase is ambiguous because it is not defined within the policy is a nonstarter. There are, quite obviously, many terms and phrases within insurance policies and similar contracts that are not internally defined but are nonetheless unambiguous. As just one example, Eberhardinger's policy states that State Farm has "the right to investigate, negotiate, and settle any claim or lawsuit . . . for damages payable under this policy's Liability Coverage." (See Doc. 61-3 Ex. C at 8). None of the specific phrases or terms in this clause is defined in the policy, yet there is no ambiguity.

Second, the phrase "arising out of the maintenance or use of a motor vehicle" has been considered repeatedly by Pennsylvania appellate courts, which have found the phrase unambiguous and have consistently applied a well-settled meaning. "Arising out of" means that there is a causal connection between the injury and the maintenance or use of a motor vehicle; cause-in-fact is sufficient— proximate causation is not required. See Mfrs. Cas. Ins. Co. v. Goodville Mut. Cas. Co., 170 A.2d 571, 607 (Pa. 1961); Allstate Property & Cas. Ins. Co. v. Squires, 667 F.3d 388, 391-92 (3d Cir. 2012) (applying Pennsylvania law).

Accordingly, not all injuries that occur to persons while they occupy or travel in a motor vehicle necessarily "aris[e] out of" the maintenance and use of a vehicle. Pennsylvania law requires "vehicle-caused injuries," not just injuries that happen

to be sustained therein, when determining if automobile insurance coverage applies.  See Cummings v. State Farm Mut. Auto. Ins. Co., 596 A.2d 1138, 1139 (Pa. Super. Ct. 1991) (citing Smith v. United Servs. Auto. Assoc., 572 A.2d 785 (Pa. Super. Ct. 1990)); see also Lucas-Raso v. Am. Mfrs. Ins. Co., 657 A.2d 1, 3-4 (Pa. Super. Ct. 1995); Huber v. Erie Ins. Exch., 587 A.2d 333, 334 (Pa. Super. Ct. 1991).  This interpretation is logical because the Motor Vehicle Financial Responsibility Law— which governs motor vehicle insurance coverage in Pennsylvania and contains language identical to the instant PIP provision and similar to the instant UIM provision, see 75 PA. CONS. STAT. §§ 1712, 1731(c)—"is not a general liability insurance intended to cover all injuries, no matter how remotely connected with the use or maintenance of a motor vehicle, but is intended to cover motor vehicle accidents."  Cummings, 596 A.2d at 1139; see also Squires, 667 F.3d at 390 n.4.

Numerous Pennsylvania Superior Court cases bear these principles out.  For example, dog bite injuries sustained while riding in a van were found not to have arisen out of the maintenance or use of a motor vehicle.  Alvarino ex rel. Alvarino v. Allstate Ins. Co., 537 A.2d 18, 19-22 (Pa. Super. Ct. 1988).  Likewise, a woman traveling on a bus who was hurt due to a fistfight between two other passengers could not receive first-party medical benefits from her automobile insurance carrier because her injuries were not caused by the use of a vehicle.  Roach v. Port Auth. of Allegheny Cty., 550 A.2d 1346, 1348, 1350 (Pa. Super. Ct. 1988).  Most pertinent to the instant case, a passenger who was accidentally shot by a police officer firing multiple rounds at a driver-suspect could not recover first-party medical benefits for her gunshot injuries because those injuries lacked a causal connection to the use

of a vehicle. <u>Erie Ins. Exch. v. Eisenhuth</u>, 451 A.2d 1024, 1025-26 (Pa. Super. Ct. 1982).

We find that Eberhardinger's injuries have no causal connection to the maintenance or use of a motor vehicle. Her gunshot wounds were sustained while she was riding in the insured vehicle, but they were not "vehicle-caused injuries." The gunshot injuries are not "attributable to common uses of a vehicle," but rather were the direct consequence of an "intentional intervening act of a third party" with only incidental vehicle involvement. <u>Squires</u>, 667 F.3d at 392-93. Accordingly, Eberhardinger's injuries are not compensable under the terms of her PIP or UIM coverage.

Even if, *arguendo*, Eberhardinger's UIM claim were not stymied by lack of causation, it is precluded by the clear language of the firearm exclusion in her UIM policy. That provision plainly states: "There is no coverage . . . for an insured whose bodily injury results from the discharge of a firearm." (Doc. 61-3 Ex. C at 26 (emphasis omitted)). We reject Eberhardinger's contention that this policy exclusion is unenforceable because it is unconscionable. Under Pennsylvania law, a contract must be both procedurally and substantively unconscionable to be found avoidable on the basis of unconscionability. <u>Salley v. Option One Mortg. Corp.</u>, 925 A.2d 115, 119 (Pa. 2007). There is a distinct absence of substantive unconscionability with the incorporation of a firearm-injury exclusion in an automobile insurance UIM policy.

We conclude that Eberhardinger is precluded from obtaining PIP benefits because her gunshot-related injuries did not arise out of the maintenance or use of

a motor vehicle.  She is unable to claim UIM benefits for the same reason.  Her UIM claim additionally fails because it is barred by the UIM firearm exclusion.  State Farm's denial of coverage on these claims was appropriate and thus did not breach the instant insurance contract.  We will grant summary judgment on Counts IV and V in State Farm's favor.

2. ***Bad Faith Claim***

Eberhardinger lastly asserts a bad faith insurance claim pursuant to 42 PA. CONS. STAT. § 8371.  To prevail on a claim of bad faith, a plaintiff must demonstrate that the insurer (1) "did not have a reasonable basis for denying benefits under the policy," and (2) "knew or recklessly disregarded its lack of a reasonable basis in denying the claim."  Rancosky v. Wash. Nat'l Ins. Co., 170 A.3d 364, 377 (Pa. 2017).  Because we have determined that State Farm had a reasonable—and in fact correct—basis for denying Eberhardinger's PIP and UIM claims, our inquiry is at an end.  We will therefore grant summary judgment to State Farm on the bad faith claim.

## IV.    <u>Conclusion</u>

Eberhardinger's claims against the City and State Farm cannot withstand Rule 56 scrutiny. Her Fourth Amendment excessive force claim against Officer Smith, however, may proceed. We will thus grant in part and deny in part the motion (Doc. 58) for summary judgment filed by the City and Officer Smith, and grant State Farm's motion (Doc. 60) for summary judgment *in toto*. An appropriate order shall issue.

/S/ Christopher C. Conner
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    September 17, 2018